Adam D. Brumm, Esq.  SBN#257906
Eden Environmental Defenders
1520 E. Covell Blvd, Suite B5-611
Davis, CA  95616
Telephone: (800) 545-7215, Extension 906
Email:  adam@edendefenders.org

Attorneys for Plaintiff
CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC, a California limited liability company,<br><br>                    Plaintiff,<br><br>          vs.<br><br>VANDER LANS & SONS, INC., a California corporation; and DOES 1-10, inclusive,<br><br>                    Defendant. | Case No.:<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq.)** |

Plaintiff CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC

("EDEN") hereby brings this civil action pursuant to the Federal Water Pollution Control Act,

also known as the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*

### INTRODUCTION

1.      This action is a citizen suit for injunctive relief, declaratory relief, civil penalties,

and remediation against Defendant Vander Lans & Sons, Inc., for current and ongoing violations

COMPLAINT – Page 1

of the National Pollutant Discharge Elimination System ("NPDES") permit requirements of the CWA.

2.      On or about October 31, 2022, EDEN provided a Notice of Defendant's violations of the CWA to (1) the Administrator of the United States Environmental Protection Agency ("EPA"), (2) the EPA's Regional Administrator for Region Nine, (3) the Executive Director of the State Water Resources Control Board ("State Board"), and (4) to Defendant, including a copy delivered to the Facility Manager of Defendant Vander Lans & Sons, Inc., by certified mail, at 1320 South Sacramento Street, Lodi, California ("the facility"), as required under 33 U.S.C. § 1365(b)(1)(A).

3.      A copy of EDEN's Notice of Intent to Sue ("Notice") is attached hereto as **Exhibit A** and is incorporated herein by reference.

4.      More than sixty ("60") days have passed since EDEN's Notice was properly and lawfully served on the Defendant, the State Board, and the Regional and National EPA Administrators.  EDEN is informed and believes, and thereupon alleges, that neither the National EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. The claim for civil penalties is therefore not barred by any prior administrative penalty under section 309(g) of the CWA, 33 U.S.C. § 1319(g).

**JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT**

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (Federal Question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief),

33 U.S.C. sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil penalties).

6.     The Permit under which this case arises is a Federally required permit based upon California state substantive law.  (*Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017), 853 F.3d 1076; *Dept. of Finance v. Commission on State Mandates,* 1 Cal.5th 749 (2016))

7.     By its express language, a violation of the State permit constitutes a per se violation of the Federal Clean Water Act.  (California's Industrial General Permit Order 2014-0057 DWQ, NPDES Order No. CAS000001, Section XXI.A)

8.     Venue is proper because Defendant resides in and the events or omissions giving rise to EDEN's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper because the Defendant's CWA violations have occurred and are occurring within the District. 33 U.S.C. § 1365(c)(1).

## PARTIES

9.     Plaintiff, CENTRAL VALLEY EDEN ENVIRONMENTAL DEFENDERS, LLC ("EDEN") is an environmental membership group organized under the laws of the State of California.

10.     EDEN's organizational purpose is the protection, preservation, and enhancement of the rivers, creeks, streams, lakes, oceans, and their tributaries located in California.

11.     EDEN's organizational purpose and mission is accomplished through enforcement of the provisions of the Federal Clean Water Act and California's Industrial General Permit by seeking redress against Industrial Dischargers who violate the Clean Water Act through failure to comply with all standard conditions of the Industrial General Permit.  These

standard conditions include, but are not limited to, discharges of polluted stormwater in violation of Federal and California criteria, deficient Stormwater Pollution Prevention Plans and Site Maps, deficient stormwater monitoring and sampling programs, protocols and reporting, deficient best management practices, deficient or non-existing exceedance response action reports, deficient or non-existing employee stormwater training programs, deficient or non-existing annual reports, and other informational deficiencies.

12.     EDEN's associational members volunteer their resources to join EDEN's organizational purpose and mission.

13.     EDEN has associational members throughout Northern California.  Some of EDEN's members reside, work, and/or recreate near the Mokelumne River, which is a tributary of the Sacramento-San Joaquin River Delta Waterways (the "Receiving Waters" for Defendant's stormwater run-off). They visit these waters and their watersheds for recreational purposes such as kayaking, canoeing, camping, cycling, sports, fishing, swimming, hiking, bird watching, photography, nature walks, and scientific study.  Their use and aesthetic enjoyment of these natural resources have been and continue to be adversely impaired by Defendant's failure to comply with the procedural and substantive requirements of the California Industrial General Permit and Federal Clean Water Act.

14.     EDEN has Article III standing as an association to bring this suit against Defendant because at least one of EDEN's current members is experiencing an ongoing, concrete, and particularized injury that is fairly traceable to Defendant's violations of the Clean Water Act and Industrial General Permit. Such injuries can be redressed by a judicial decision granting EDEN the injunctive relief requested herein.

15.     Specifically, the aesthetic and recreational interests of the individual associational members of EDEN with Article III standing have been adversely impacted by Defendant's failure to comply with the procedural and substantive requirements of the California Industrial General Permit and Federal Clean Water Act, as delineated herein.

16.     In addition to harming the aesthetic and recreational interests of EDEN's members with standing in this matter, Defendant's procedural violations of the published conditions of California's Industrial General Permit have caused informational injuries to EDEN's standing members by depriving these members of their substantive constitutional and statutory rights to obtain information regarding Defendant's compliance with California's Industrial General Permit as delineated herein. These provisions have been instituted by the relevant regulatory agencies for the purposes of protecting the Waters of the United States.

17.     EDEN's associational members who qualify for standing in this matter are current members who have been members of EDEN since at least the date that EDEN provided to Defendant the 60-day Notice of Intent to Sue attached hereto as **Exhibit A** and incorporated herein by reference**.**

18.     In the absence of judicial intervention, Defendant's ongoing violations of the General Permit and the Clean Water Act will continue to cause harm to EDEN and its current standing members.

19.     The relief requested herein will redress the ongoing injury in fact to EDEN and its members.

20.     Neither litigation of the claims asserted nor the relief requested in this Complaint will require the participation of any individual members of EDEN.

21.     EDEN is informed and believes, and on such information and belief alleges that Defendant, VANDER LANS & SONS, INC., is doing business as Lansas Products, located at 1320 South Sacramento Street, in Lodi, California, and is a California corporation in good standing with the California Secretary of State.

22.     EDEN is informed and believes, and on such information and belief alleges that Defendant is identified in the Regional Water Board's records as the Industrial General Permit applicant and operator of the facility.

## STATUTORY BACKGROUND

23.     Congress has declared that the Federal Clean Water Act is designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through federal and state cooperation to develop and implement "programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters." 33 U.S.C. §§ 1251(a), 1252(a).

24.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act; *inter alia,* Section 301(a) prohibits discharges not authorized by, or in violation of the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

25.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial stormwater discharges under the NPDES program. 33 U.S.C. § 1342(p).

26.     States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial stormwater discharges through individual permits issued to dischargers or through the issuance of a single statewide general permit that is applicable to all industrial stormwater dischargers. 33 U.S.C. § 1342(p).

27.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Water Resources Control Board ("Water Board") to issue NPDES permits, including general NPDES permits in California.

General Permit

28.     The State Board elected to issue a statewide general permit for industrial storm-water discharges. The State Board originally issued the General Permit on November 19, 1991, and modified it on September 17, 1992.   The State Board reissued the General Permit on April 17, 1997, and again on April 1, 2014 (the "2015 Permit" or "General Permit") pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

29.     The 1997 Permit was in effect between 1997 and June 30, 2015.  The 2015 Permit went into effect on July 1, 2015.  The 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit.

30.     On November 16, 2018, the State Water Board adopted a revised General Permit (Order No. 2018-XXXX-DWQ) which technically became effective on July 1, 2020.  However, the 2018 Revisions have not officially been finalized or certified by the Clerk of the State Water Board as of the date of this Complaint. For this reason, the order remains identified by use of the "XXXX."

31.     To lawfully discharge stormwater in California, all industrial facilities discharging, or having the potential to discharge stormwater associated with industrial activity ("Dischargers") which have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

32.     The specific industrial facilities required to apply for General Permit coverage are identified on Attachment A to the General Permit.

33.     The General Permit contains several prohibitions. Effluent Limitation V(A) of the General Permit requires Dischargers to reduce or prevent pollutants in their stormwater discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and non-conventional pollutants, and also the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition III(C) of the General Permit prohibits stormwater discharges and authorized non-stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance.

34.     Receiving Water Limitation VI(B) of the General Permit prohibits stormwater discharges to any surface or ground water that adversely impacts human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit prohibits stormwater discharges that cause or contribute to an exceedance of any applicable water quality standard contained in Statewide Water Quality Control Plan, or the applicable Regional Board's Basin Plan.

35.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that Dischargers must meet.

36.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe stormwater control facilities and measures that comply with BAT and BCT standards.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater discharges and authorized non-stormwater discharges from the facility, and to implement best management practices ("BMPs") that reduce or prevent pollutants associated

with industrial activities in stormwater discharges and authorized non-stormwater discharges. General Permit, § X(C). These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

37.     To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, § X(B).

38.     Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit Fact Sheet §I(1).

39.     Sections X(D) – X(I) of General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges.

40.     The General Permit further requires dischargers to implement and maintain to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial stormwater discharges: exposure minimization BMPs, stormwater containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  General Permit, § X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with technology or water quality standards is a violation of the General Permit.

41.     The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table.  General Permit, § X(H)(4), (5).

42.     The General Permit requires Dischargers to develop and implement an adequate written Monitoring and Reporting Program.  The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

43.     As part of their Monitoring Program, Dischargers must identify all stormwater discharge locations from which there is significant flow, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.

44.     Section XI(B) of the General Permit requires that Dischargers collect and analyze stormwater samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30). These samples must be collected from all outfalls identified in the facility SWPPP.

45.     A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.  General Permit §XI(B)(2)

46.     Once the stormwater samples have been collected, the General Permit requires that the Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload into SMARTS the resulting laboratory reports within 30 days from receipt of the report.  General Permit § XI(B)(4)

47.     Facilities are also required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event.  General Permit, § XI(A)

48.     The General Permit requires Dischargers to conduct an Annual Comprehensive facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations, sampling, and analysis results. General Permit, § XV.

49.     Under the General Permit, facilities must analyze stormwater samples for pH, oil & grease, and total suspended solids, as well as additional parameters indicated in the Permit by facility type and those parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment.  General Permit, § XI(B)(6)(c).

50.     The US EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial stormwater has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a stormwater discharge could potentially impair, or contribute to impairing water quality, or affect human health from ingestion of water or fish.

51.     The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks. The Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs which are derived from a Water Board dataset.

52.     The following annual NALs have been established under the General Permit for pollution parameters applicable to all Dischargers: pH – 6.0 - 9.0 standard units ("S.U."); total

suspended solids ("TSS") – 100 mg/L; oil & grease ("O&G") – 15 mg/L; iron – 1.0 mg/L, nitrite + nitrate as nitrogen --.68 mg/L, zinc --.26 mg/L, phosphorus --2.0 mg/L, aluminum – .75 mg/L, lead – .262 mg/L, copper – .0332 mg/L, nickel – 1.02 mg/L and chemical oxygen demand – 120 mg/L.

53.     An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  General Permit §XII(A)

54.     When a Discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs. If a Discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  General Permit § XII(C)

55.     For Level 2 Status, a Discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.  General Permit §XII(D)

56.     The Water Board has established an online database known as the Stormwater Multiple Application and Tracking System ("SMARTS").  SMARTS is a platform where Dischargers, regulators, and the public can enter, manage, and view stormwater data associated with General Permit compliance.

57.     The General Permit requires Dischargers to upload to SMARTS all Permit Registration Documents, including SWPPPs and Site Maps, monitoring and sampling data, and also their Annual Reports.

58.     Section XVI(A) of the General Permit requires that all Dischargers must certify and submit to SMARTS an Annual Report no later than July 15th following each reporting year, using the standardized format and checklists in SMARTS.

59.     Furthermore, Section XXI(L) of the General Permit provides that all documents submitted to SMARTS, including SWPPPs and Annual Reports, be certified by a legally responsible party or duly authorized representative of the facility, with the following certification:

"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

60.     Section XXI(N) of the General Permit provides that any person who knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under the General Permit, including reports of compliance or noncompliance shall upon conviction, shall be punished by a fine of not more than $10,000, or by imprisonment for not more than two years, or by both.  *See also* Clean Water Act section 309(c)(4)

Central Valley Region Basin Plan

61.     The Regional Board has identified beneficial uses of the Central Valley Region's waters and established water quality standards for the Sacramento River and its tributaries, and

the Sacramento-San Joaquin Delta in "The Water Quality Control Plan (Basin Plan) for the California Regional Water Quality Control Board, Central Valley Region – *The Sacramento River Basin and The San Joaquin River Basin*," which is generally referred to as the Basin Plan, and also the "Water Quality Control Plan for the San Francisco Bay/Sacramento-San Joaquin Delta Estuary."

62.     The beneficial uses of these waters include, *inter alia*, domestic and municipal supply, water contact recreation, non-contact water recreation, wildlife habitat, warm and cold freshwater habitat, and fish spawning. The non-contact water recreation use is defined as "uses of water for recreational activities involving proximity to water, but where there is generally no body contact with water, nor any likelihood of ingestion of water." These uses include, but are not limited to, "picnicking, sunbathing, hiking, camping, boating. . . hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities."

63.     The Basin Plan includes a narrative toxicity standard which states that all waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life.

64.     The Basin Plan provides that water shall not contain floating material in amounts that cause nuisance or adversely affect beneficial uses.

65.     The Basin Plan provides that water shall be free of discoloration that causes nuisance or adversely affects beneficial uses.

66.     The Basin Plan provides that waters shall not contain suspended materials in concentrations that cause nuisance or adversely affect beneficial uses.

67.     The Basin Plan also prohibits the discharges of oil and grease, stating that waters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance,

result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses.

68.     The Basin Plan provides that at a minimum, water designated for use as domestic or municipal supply ("MUN") shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels ("MCLs") specified in the following provisions of Title 22 of the California Code of Regulations, which are incorporated by reference into this plan: Tables 64431-A (Inorganic Chemicals), 64431-B (Fluoride) of Section 64431, Table 64444-A (Organic Chemicals) of Section 64444, Tables 64449-A (Secondary Maximum Contaminant Levels-Consumer Acceptance Limits), and 64449-B (Secondary Maximum Contaminant Levels-Ranges) of Section 64449.

69.     Title 22 of the California Code of Regulations provides a MCL for aluminum of 1.0 mg/L, for cadmium of .01 mg/L, and lead of .05 mg/L.

70.     The Basin Plan provides that the pH shall not be depressed below 6.5 nor raised above 8.5; that iron levels not exceed .30 mg/L; that zinc not exceed .10 mg/L; that copper not exceed .0056 mg/L, and that cadmium not exceed .00022 mg/L.

71.     The Basin Plan requires that waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses.

72.     Table III-1 of the Basin Plan provides a water quality objective ("WQO") for iron of .30 mg/L.

Citizen Suit Provision of the CWA

73.     Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of an effluent standard or limitation under the CWA or an Order issued by a State with respect to such a standard or limitation. 33 U.S.C. §1365(a)(1). No action

may be commenced prior to sixty ("60") days after the plaintiff has given notice of the alleged violation to (i) the Administrator of the EPA, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order. 33 U.S.C. § 1365(b)(1)(A).  By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the government or by concerned citizens.

74.     In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the District Court's jurisdiction to apply any appropriate civil penalties under section 1319(d).  33 U.S.C. § 1365(a). Section 1319(d) declares that any person who violates a permit condition or limitation implementing any of such sections in an NPDES permit shall be subject to a civil penalty not to exceed $46,192.00 per day for each violation occurring before November 2, 2015, and $56,460.00 per day per violation for violations occurring after November 2, 2015.  33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI.Q.1.

75.     Violation of these provisions in the General Permit, including those detailed below, also constitute violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§ 1319(d), 1342; 40 C.F.R. §§ 19.1-19.4.

## FACTUAL ALLEGATIONS GIVING RISE TO CLAIMS

76.     Defendant is a facility that manufactures rubber plugs for the sewer industry. EDEN is informed and believes that the facility falls under standard industrial classification ("SIC") code 3069.

77.     EDEN is informed and believes that Defendant stores industrial materials outdoors that can be exposed to stormwater, eroded by wind, and otherwise contaminate the surrounding watershed.

78.     Plaintiff is informed and believes, and thereupon alleges that during rain events, stormwater flows over the surface of the facility where industrial activities occur and areas where airborne materials associated with industrial processes at the facility may settle onto the ground. Plaintiff is informed and believes, and thereupon alleges that stormwater flowing over these areas collects suspended sediment, dirt, metals, and other pollutants as it flows towards the facility's stormwater channels.

79.     Based on EDEN's investigation, including a review of the Defendant's Notice of Intent to Comply with the Terms of the Industrial General Permit ("NOI"), SWPPP, aerial photography, Federal, State, and local regulatory agency mapping tools, and EDEN's information and belief, stormwater leaves the boundaries of Defendant's facility and enters the Mokelumne River, a navigable Water of the United States.

80.     Plaintiff is informed and believes, and thereupon alleges, that the best management practices at the facility are currently inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.

Deficient SWPPP/Failure to Follow SWPPP

81.     On information and belief, Plaintiff alleges that since at least February 21, 2018, Defendant has failed to implement an adequate SWPPP for its facility.

82.     Plaintiff is informed and believes, and thereupon alleges, that Defendant's SWPPP and Site Map do not include each of the mandatory elements required by Section X of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A** and incorporated herein by reference**.**

83.     According to information available to EDEN, Defendant's SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges.

84.     Plaintiff is informed and believes, and thereupon alleges, that Defendant's SWPPP does not set forth site-specific Best Management Practices (BMPs) for the facility that are consistent with BAT or BCT.

85.     Plaintiff is informed and believes, and thereupon alleges, that Defendant has failed and continues to fail to alter the facility's SWPPP and site-specific BMPs consistent with the General Permit.

86.     In addition, Plaintiff alleges that Defendant has failed to comply with the provisions of its current SWPPP in the areas of monitoring and reporting.

87.     Information available to EDEN indicates that as a result of these practices, storm-water containing excessive pollutants is being discharged during rain events into the Mokelumne River.

88.     Plaintiff is informed and believes, and thereupon alleges, that all the violations alleged above with respect to Defendant's deficient SWPPP are ongoing and continuous.

Monitoring and Reporting

89.     On information and belief, EDEN alleges that Defendant has an inadequate monitoring program at its facility, as is more particularly described in the Notice Letter attached hereto as **Exhibit A** and incorporated herein by reference.

90.     On information and belief, EDEN alleges that since February 21, 2018, Defendant has failed to collect and analyze two stormwater samples from the first half of each reporting

year, and two stormwater samples from the second half of each reporting year, as required by General Permit §XI(B).

91.     On information and belief, EDEN alleges that Defendant has failed to conduct monthly visual observations of stormwater discharges at the facility since at least February 21, 2018.

92.     EDEN is informed and believes that Defendant has failed to analyze the facility's stormwater samples for the required parameters, in violation of Section XI(B)(6) of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A** and incorporated herein by reference.

93.     EDEN is informed and believes that Defendant has failed to upload facility storm-water sample analyses within 30 days of obtaining the results of the sampling event, in violation of Section XI(B)(11) of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A** and incorporated herein by reference.

94.     EDEN is informed and believes that Defendant has failed to properly analyze its collected stormwater sample for the parameter of pH, in violation of Section XI(C)(2)(a) of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A** and incorporated herein by reference.

Falsification of Annual Reports

95.     EDEN is informed and believes that since February 21, 2018, Defendant has submitted inaccurate and/or falsified Annual Reports to the Regional Water Quality Control Board in violation of Sections XXI(L) and XXI(N) of the General Permit, as is more particularly described in the Notice Letter attached hereto as **Exhibit A** and incorporated herein by reference.

Failure to Implement BAT/BCT and BMPs

96.     EDEN is informed and believes that since at least February 21, 2018, Defendant has failed to identify and implement Best Management Practices ("BMPs") at its facility that comply with the requirements of the General Permit for best conventional treatment (BCT) for conventional pollutants, as well as the best available technology (BAT) for toxic and non-conventional pollutants. These technology-based pollution controls are required to be implemented in a manner that reflects best industry practice considering technological availability and economic practicability and achievability.  General Permit §§ I(C), V(A).

97.     Defendant's BMP deficiencies are more particularly described in the Notice Letter attached hereto as **Exhibit A** and incorporated herein by reference.

98.     Information available to EDEN indicates that as a result of these practices, storm-water containing excessive pollutants is being discharged during rain events from the facility to the Mokelumne River.

Discharges of Contaminated Storm Water

99.     Information available to EDEN indicates that unauthorized non-stormwater discharges occur at the facility due to inadequate BMP development and/or implementation necessary to prevent these discharges, as is more particularly described in the Notice Letter attached hereto as **Exhibit A** and incorporated herein by reference.

100.    Due to the nature of the operations at the facility, coupled with the documented lack of proper BMP implementation and unauthorized non-stormwater discharges, Defendant is discharging stormwater containing excessive levels of pollutants specific to its operation during at least every significant local rain event.

101.    Since at least February 21, 2018, Defendant has reported numerous discharges in excess of narrative and numeric water quality standards established in the Basin Plan, as is more

particularly described in the Notice Letter attached hereto as **Exhibit A** and incorporated herein by reference.

102.     Since at least February 21, 2018, Defendant has reported numerous discharges in excess of the benchmark value and annual numeric action limits established by EPA and the Water Board, as is more particularly described in the Notice Letter attached hereto as **Exhibit A** and incorporated herein by reference.

Failure to Comply with Required Exceedance Response Actions

103.     On July 1, 2020, Defendant was elevated to Level 1 Status for exceedances of iron; and on July 1, 2021, Defendant was elevated to Level 2 Status for continuing exceedances of iron.

104.     Pursuant to Section XII of the General Permit, Defendant's Level 1 ERA Report was due to be prepared and uploaded into SMARTS by January 1, 2021; and Defendant's Level 2 Action Plan was due to be prepared and uploaded into SMARTS by January 1, 2022.

105.     To date, Defendant has failed to submit either its Level 1 ERA Report, or its Level 2 Action Plan, as is more particularly described in the Notice Letter attached hereto as **Exhibit A**.

Failure to Train Employees

106.     The General Permit requires all Dischargers to designate a Legally Responsible Person to implement the requirements of the Permit.  The Legally Responsible Person is responsible for appointing a Pollution Prevention Team and ensuring that the Team is properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

107.    Plaintiff is informed and believes that since at least February 21, 2018, Defendant has failed to implement and train a Pollution Prevention Team at its facility.

**FIRST CAUSE OF ACTION**
**Failure to Prepare, Implement, Review, and Update**
**an Adequate Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

108.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

109.    The General Permit requires Dischargers of stormwater associated with industrial activity to develop and implement an adequate SWPPP.

110.    As outlined herein, Defendant has failed to develop and implement an adequate SWPPP for its facility.

111.    Each day since February 21, 2018, that Defendant has failed to develop, implement, and update an adequate SWPPP for the facility is a separate and distinct violation of both the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). These violations are ongoing and continuous.

**SECOND CAUSE OF ACTION**
**Failure to Develop and Implement an**
**Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

112.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

113.    The General Permit requires Dischargers of stormwater associated with industrial activity to have developed and be implementing a monitoring and reporting program (including sampling and analysis of discharges) that complies with the terms of the General Permit.

114.    As outlined herein, Defendant has failed to develop and implement an adequate monitoring and reporting program for its facility.

115.    Each day since at least February 21, 2018, that Defendant has failed to develop and implement an adequate monitoring and reporting program is a separate and distinct violation of both the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a). The absence of requisite monitoring and analytical results are evidence of ongoing and continuous violations of the Act.  It's *res ipsa loquitur*; the thing speaks for itself.

**THIRD CAUSE OF ACTION**
**Submission of False Annual Reports to the Regional Water Board**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

116.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

117.    Section XVI of the General Permit requires that Annual Reports submitted to SMARTS be certified under penalty of law, pursuant to Section XXI(L), which provides significant penalties for submitting false information.

118.    Specifically, Clean Water Act section 309(c)(4) and Section XXI(N) of the General Permit provide a maximum penalty to any person who knowingly makes a false material statement, representation, or certification in any record or other document submitted or required to be maintained under the General Permit, including Annual Reports, up to and including a fine of $10,000 and imprisonment for two years, or both.

119.    As delineated herein, Defendant made false representations in the facility's Annual Report(s).

120.    Each time since February 21, 2018 that Defendant submitted false statements to the Water Board under penalty of perjury is a separate and distinct violation of the General

Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

## FOURTH CAUSE OF ACTION
### Failure to Implement the Best Available and
### Best Conventional Treatment Technologies
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

121.   Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

122.   The General Permit's SWPPP requirements and Effluent Limitation V(A) of the General Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

123.   As alleged herein, Defendant has failed to implement BAT and BCT at the facility for its discharges of pollutants, in violation of Effluent Limitation V(A) of the General Permit.

124.   Each day since at least February 21, 2018 that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

## FIFTH CAUSE OF ACTION
### Discharges of Contaminated Storm Water
### in Violation of Permit Conditions and the Act
### (Violations of 33 U.S.C. §§ 1311, 1342)

125.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

126.   Discharge Prohibition III(C) of the General Permit prohibits stormwater discharges and authorized non-stormwater discharges that cause or threaten to cause pollution,

contamination, or nuisance. Receiving Water VI(B) of the General Permit prohibits stormwater discharges to any surface or ground water that adversely impacts human health or the environment. Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit prohibits stormwater discharges that cause or contribute to an exceedance of any applicable water quality standards contained in the Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

127.    Plaintiff is informed and believes, and thereupon alleges, that since at least February 21, 2018, this Defendant has been discharging polluted stormwater from its facility in excess of applicable water quality standards. To do so is a  violation of Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the General Permit.

128.    During every rain event, stormwater flows freely over exposed materials, waste products, and other accumulated pollutants; becoming contaminated with the pollutant materials associated with industrial activity that occurs at Defendant's facility. The polluted stormwater then flows untreated into the Mokelumne River.

129.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated stormwater are causing or contributing to the violation of the applicable water quality standards in the Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of the Receiving Water Limitations of the General Permit.

130.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated stormwater are adversely affecting human health and the environment in violation of Receiving Water Limitations of the General Permit.

131.    Every day since at least February 21, 2018 that Defendant has discharged and continues to discharge polluted stormwater from its facility in violation of the General Permit is

a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These

violations are ongoing and continuous.


**SIXTH CAUSE OF ACTION**
**Failure to Comply with Required Exceedance Response Actions**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

132.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set

forth herein.

133.    The General Permit requires that all Dischargers who enter Level 1 or Level 2

status comply with specific Exceedance Response Actions delineated in Section XII of the

General Permit.

134.    As herein alleged, Defendant has failed to date to comply with the Exceedance

Response Actions required of it by the General Permit.

135.    Each day since February 21, 2018 that Defendant has failed to comply with the

Exceedance Response Actions required by the General Permit is a separate and distinct violation

of both the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations

are ongoing and continuous.


**SEVENTH CAUSE OF ACTION**
**Failure to Properly Train facility Employees and Pollution Prevention Team**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

136.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set

forth herein.

137.    Section X(D)(1) of the General Permit requires each facility to establish a

Pollution Prevention Team responsible for implementing the requirements of the General Permit.

The facility is also required to identify alternate team members to implement the SWPPP and

conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

138.    Section X(H)(f) of the General Permit also requires that each facility ensure that all of its Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained.

139.    Since at least February 21, 2018, Defendant has failed to properly implement and train a Pollution Prevention Team, which has resulted in the General Permit violations alleged herein.  These violations are ongoing and continuous.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.    Declare Defendant to have violated and to be in violation of the CWA;

2.    Issue an injunction ordering Defendant to immediately operate its facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

3.    Enjoin Defendant from discharging pollutants to the surface waters surrounding its facility until such time as Defendant has developed and implemented an adequate SWPPP and implemented appropriate BMPs;

4.    Order Defendant to pay civil penalties of $56,460.00 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

5.    Order Defendant to take appropriate actions to restore the quality of United States waters impaired by activities at its facility;

6.      Order Defendant to pay EDEN's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law;

7.      Award Plaintiff additional attorney fees under California Code of Civil Procedure §1021.5, to the extent that Plaintiff's Notice of Intent to Sue directed to Defendant was the catalyst for Defendant's voluntary corrective action or cessation of the violations included in Plaintiff's Notice, provided that Defendant undertook any such corrective action after receiving Plaintiff's Notice, and;

8.      Award such other and further relief as may be just and proper.

Dated:  February 18, 2023

By: ___/S/ Adam D. Brumm_____
        Adam D. Brumm
        Attorney for Plaintiff

# EXHIBIT A



*Central Valley* Eden Environmental Defenders

October 31, 2022

<u>Via US Mail, Certified and Email</u>

Eric Vanderlans                 Email:  evanderlans@lansas.com
Vanderlans & Sons
1320 South Sacramento Street
Lodi, CA 95240

<u>Via US Mail</u>

Nicholas Bettencourt
Agent for Vander Lans & Sons, Inc.
1320 South Sacramento Street
Lodi, CA 95240

Gerald J. Vanderlans Family Trust
1320 South Sacramento Street
Lodi, CA 95240

**Re:     60-Day Notice of Violations and Intent to File Suit Under the Federal Water
           Pollution Control Act ("Clean Water Act")**

To Officers, Directors, Operators, Property Owners and/or Facility Managers of Vander Lans &
Sons Inc:

This letter is being sent to you on behalf of Central Valley Eden Environmental Defenders, LLC
("EDEN") to give legal notice that EDEN intends to file a civil action against Vander Lans &
Sons, Inc., also known as Vanderlans & Sons, Inc, also known as Lansas Products ("Discharger"
or "Vanderlans & Sons") and the respective corporate officers and other legally responsible
parties for violations of the Federal Clean Water Act ("CWA" or "Act") 33 U.S.C. § 1251 *et seq.,*
that EDEN believes are occurring at the Lansas/Vanderlans & Sons facility located at 1320
South Sacramento Street in Lodi, California ("the Facility" or "the site").

          EDEN is an environmental citizen's group established under the laws of the State of
California to protect, enhance, and assist in the restoration of all rivers, creeks, streams, sloughs,
lakes and tributaries of California, for the benefit of its ecosystems and communities.

As discussed below, the Facility's discharges of pollutants degrade water quality and harm aquatic life in the Facility's Receiving Waters, which are waters of the United States and are described in Section II.B, below.  EDEN has members throughout California.  Some of EDEN's members live, work, and/or recreate near the Receiving Waters and use and enjoy the Receiving Waters for kayaking, canoeing, camping, fishing, boating, swimming, hiking, cycling, bird watching, picnicking, viewing wildlife, and/or engaging in scientific study.

At least one of EDEN's current members has standing to bring suit against Vanderlans & Sons, as the unlawful discharge of pollutants from the Facility as alleged herein has had an adverse effect particular to him or her and has resulted in actual harm to the specific EDEN member(s).

Further, the Facility's discharges of polluted storm water and non-storm water are ongoing and continuous.  As a result, the interests of certain individual EDEN members have been, are being, and will continue to be adversely affected by the failure of Vanderlans & Sons to comply with the General Permit and the Clean Water Act.

CWA section 505(b) requires that sixty (60) days prior to the initiation of a civil action under CWA section 505(a), a citizen must give notice of intent to file suit. 33 U.S.C. § 1365(b). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA"), and the EPA in the state in which the violations occurred or are occurring.

As required by CWA section 505(b), this Notice of Violation and Intent to File Suit provides notice to the Discharger of the violations which have occurred and continue to occur at the Facility.  After the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, EDEN reserves the right to file suit in federal court against Vanderlans & Sons under CWA section 505(a) for the violations described more fully below, if this matter cannot be resolved.

## I.        THE SPECIFIC STANDARD, LIMITATION OR ORDER VIOLATED

EDEN's investigation of the Facility has uncovered significant, ongoing, and continuous violations of the CWA and the General Industrial Storm Water Permit issued by the State of California (NPDES General Permit No. CAS000001 [State Water Resources Control Board ("SWRCB")] Water Quality Order No. 2014-0057-DWQ as amended by Orders 2015-0122-DWQ and 2018-XXXX-DWQ) (hereinafter "General Permit").

Information available to EDEN, including documents obtained from California EPA's online Storm Water Multiple Application and Reporting Tracking System ("SMARTS"), indicates that on or around November 30, 2000, Vanderlans & Sons submitted a Notice of Intent ("NOI") to be authorized to discharge storm water from the Facility under the General Permit. Vanderlans & Sons' assigned Waste Discharger Identification number ("WDID") is 5S39I016258.

As more fully described in Section III, below, EDEN alleges that in its operations of the Facility, Vanderlans & Sons has committed ongoing violations of the substantive and procedural requirements of the Federal Clean Water Act, California Water Code §13377, et seq; the General Permit; the Regional Water Board Basin Plan; the California Toxics Rule (CTR); 40 C.F.R. Chapter I, Subchapter N, § 400, et seq.; and California Code of Regulations, Title 22, § 64431.

## II.     THE LOCATION OF THE ALLEGED VIOLATIONS

### A.  **The Facility**

The location of the point sources from which the pollutants identified in this Notice are discharged in violation of the CWA is Vanderlans & Sons' permanent facility address of 1320 South Sacramento Street in Lodi, California.

Vanderlans & Sons is a facility that manufactures rubber plugs for the sewer industry. Facility operations are covered under Standard Industrial Classification Code (SIC) 3069 - Fabricated rubber products, NEC and coating mills.

Based on the EPA's Industrial Storm Water Fact Sheet for industrial businesses with the SIC code of 3069, stormwater run-off discharges contain many pollutants on the list of chemicals published by the State of California known to cause cancer, birth defects, and/or developmental or reproductive harm, including toxic and heavy metals, pH affecting substances, total suspended solids (TSS), and various types of oil and grease (O&G), as well as zinc and benzene, sulfur and ammonia.

Information available to EDEN indicates that the Facility's industrial activities and associated materials are exposed to storm water, and that each of the substances listed on the EPA's Industrial Storm Water Fact Sheet is a potential source of pollutants at the Facility.

### B.  **The Affected Receiving Waters**

The Facility discharges into the Mokelumne River ("Receiving Waters") located within the Sacramento-San Joaquin River Delta.  The Mokelumne River is impaired for Chlorpyrifos, Dissolved Oxygen, Copper, Mercury and Zinc.

The Mokelumne River is a water of the United States.  The CWA requires that water bodies such as the Mokelumne River meet water quality objectives that protect specific "beneficial uses." The Regional Water Board has issued its *Water Quality Control Plan for the Sacramento-San Joaquin Delta Basin* ("Basin Plan") to delineate those water quality objectives.

The Basin Plan identifies the "Beneficial Uses" of water bodies in the region. The Beneficial Uses for the Receiving Waters downstream of the Facility include: Municipal and Domestic Supply (MUN), Agricultural Supply (AGR), Industrial Process Supply (PRO), Industrial Service Supply (IND), Navigation (NAV), Water Contact Recreation (REC-1), Non-contact Water Recreation (REC-2), Warm Freshwater Habitat (WARM), Cold Freshwater Habitat (COLD), Wildlife Habitat (WILD), Migration (MIGR), and Spawning, Reproduction, and/or Early Development (SPWN).

A water body is impaired pursuant to section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d), when its Beneficial Uses are not being achieved due to the presence of one or more pollutants. Polluted storm water and non-storm water discharges from industrial facilities, such as the Facility, contribute to the further degradation of already impaired surface waters, and harm aquatic dependent wildlife.

## III.     VIOLATIONS OF THE CLEAN WATER ACT AND GENERAL PERMIT

### A. _Deficient SWPPP and Site Map_

Vanderlans & Sons' current Storm Water Pollution Prevention Plan ("SWPPP") and Site Map for the Facility are inadequate and fail to comply with the requirements of the General Permit as specified in Section X of Order No. 2014-0057-DWQ, as delineated below.

(a) The Site Map does not include the minimum required components for Site Maps as indicated in Section X.E of the General Permit, or the following components are inaccurate or incomplete:

   1) locations of storm water collection and conveyance systems associated with discharge locations and the accurate flow direction; and

   2) locations and descriptions of structural control measures that affect industrial storm water discharges, authorized NSWDs and/or run-on.

(b) The SWPPP fails to include an appropriate discussion of the **Industrial Materials** handled at the facility, including the locations where the materials are stored, received, shipped and handled, and the quantities and handling frequency of the Industrial Materials (Sections X.A.3, X.F, X.G.1.a);

(c) The SWPPP fails to discuss in detail **Facility operations and all industrial processes** at the Facility, including manufacturing, cleaning, maintenance, recycling, disposal, and any other activities related to each industrial process; and the type, characteristics, and approximate quantity of industrial materials used in or resulting from the process. Areas protected by containment structures and the

corresponding containment capacity are also required to be identified and described.
(X.G.1.a);

(d) The SWPPP fails to include an adequate description of **Potential Pollutant Sources**
and narrative assessment of all areas of industrial activity with potential industrial
pollutant sources, including Industrial Processes, Material Handling and Storage
Areas, Dust and Particulate Generating Activities, Significant Spills and Leaks,
Non-Storm Water Discharges and Erodible Surfaces (Section X.G);

(e) The **Minimum Best Management Practices** (BMPs) as indicated in the SWPPP
are insufficient and/or they do not comply with the minimum required categories as
listed in the General Permit, which include Good Housekeeping, Preventive
Maintenance, Spill and Leak Prevention and Response, Material Handling and
Waste Management, Erosion and Sediment Controls, Employee Training Program
and Quality Assurance and Record Keeping (Section X.H.1);

(f) The **Advanced BMP**s as identified in the SWPPP are inadequate to comply with
the Best Available Technology ("BAT") and Best Conventional Pollutant Control
Technology ("BCT") requirements of the General Permit to reduce or prevent
discharges of pollutants in the Facility's storm water discharge in a manner that
reflects best industry practice, considering technological availability and economic
practicability and achievability, including Exposure Minimization BMPs, Storm
Water Containment and Discharge Reduction BMPs or Treatment Control BMPs
(Section X.H.2);

(g) The SWPPP fails to include a **BMP Summary Table** summarizing each identified
area of industrial activity, the associated industrial pollutant sources, the industrial
pollutants and the BMPs being implemented (Section X.H.4 and X.H.5);

(h)  The SWPPP fails to include an adequate description of the Facility's **oil/water
seperator treatment control BMP**;

(i) The SWPPP fails to identify all **Non-Storm Water Discharges (NSWD**s) sources
and drainage areas, including an evaluation of all drains (inlets and outlets) that
identifies connections to the storm water conveyance system, and a description of
how all unauthorized NSWDs have been eliminated (Section X.G.e);

(j) The SWPPP fails to include an appropriate **Monitoring Implementation Plan**,
including **an identification of team members assigned to conduct monitoring
requirements**, a detailed and accurate description of all discharge locations, a
discussion of Visual Observation procedures, justifications for alternative discharge
locations, if any, procedures for field instrument calibration instructions, and an

example Chain of Custody form to be used when handling and shipping water quality samples to the lab (Section X.I);

(k) The SWPPP fails to include an adequate discussion of the **Facility's Receiving Waters.** (Section XI.B.6.e, Section X.G.2.ix);

(l) The SWPPP does not contain an adequate pollutant source assessment and the corresponding proper **sampling parameters** to include all potential pollutants present at the facility likely to come into contact with stormwater (Section XI.B.6).

EDEN's investigation confirms that **benzene, sulfur and ammonia** are present in industrial operations at the Facility, including that the potential pollutant materials are stored outdoors. The SWPPP fails to include these pollutants as **additional sampling parameters**, in violation of Section XI.B.6.c of the General Permit.

(m) The SWPPP fails to include an appropriate and complete discussion of **drainage areas and Outfalls** from which samples must be taken during Qualified Storm Events (Section XI);

(n) The SWPPP fails to identify whether the Facility is subject to 40 CFR Subchapter N ELGs, or incorrectly states that the Facility is not subject to the ELGs; and

(o) The SWPPP fails to specify that the Facility is subject to Section XVIII of the General Permit (special requirements for facilities which handle plastic materials) and further fails to incorporate the required additional BMPs.

Failure to develop or implement an adequate SWPPP is a violation of Sections II.B.4.f and X of the General Permit.

### B. _Failure to Update SWPPP_

As discussed above, the Facility entered Level 1 Status on July 1, 2017. The Level 1 ERA Report prepared P.E. Daniel Barber on January 6, 2018, indicated a number of recommended BMP additions and modifications that, pursuant to Section XII(C)(2)(a) of the General Permit, required the Facility to update its SWPPP no later than January 1 following the Facility's entry into Level 1 Status.

As of the date of this Notice, Vanderlans & Sons has failed to upload an amended SWPPP pursuant to Sections X.B and XII.C.2.a of the General Permit.

Vanderlans & Sons was required to update its SWPPP and upload it to SMARTS no later than January 1, 2018, but failed to do so.

### C. Failure to Develop, Implement and/or Revise an Adequate Monitoring and Reporting Program Pursuant to the General Permit

Section XI of the General Permit requires Dischargers to develop and implement a storm water monitoring and reporting program ("M&RP") prior to conducting industrial activities. Dischargers have an ongoing obligation to revise the M&RP as necessary to ensure compliance with the General Permit.

The objective of the M&RP is to detect and measure the concentrations of pollutants in a facility's discharge, and to ensure compliance with the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. An adequate M&RP ensures that BMPs are effectively reducing and/or eliminating pollutants at the Facility, and it must be evaluated and revised whenever appropriate to ensure compliance with the General Permit.

1. Failure to Conduct Visual Observations

Section XI.A of the General Permit requires all Dischargers to conduct visual observations at least once each month, and sampling observations at the same time sampling occurs at a discharge location.

Observations must document the presence of any floating and suspended material, oil and grease, discolorations, turbidity, odor and the source of any pollutants. Dischargers must document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants in storm water discharges.

EDEN believes that between November 1, 2017 and the present, Vanderlans & Sons has failed to conduct monthly and sampling visual observations pursuant to Section XI.A of the General Permit and to maintain contemporaneous written Visual Observation Reports confirming that visual observations were conducted.

2. Failure to Collect and Analyze the Required Number of Storm Water Samples

In addition, EDEN alleges that Vanderlans & Sons has failed to provide the Regional Water Board with the minimum number of annual documented results of Facility run-off sampling as required under Sections XI.B.2 and XI.B.11.a of Order No. 2014-0057-DWQ, in violation of the General Permit and the CWA.

Section XI.B.2 of the General Permit requires that all Dischargers collect and analyze storm water samples from two Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

Section XI.C.6.b provides that if samples are not collected pursuant to the General Permit, a proper and accurate explanation must be included in the Annual Report.

As of the date of this Notice, Vanderlans & Sons has failed to upload into the SMARTS database system the required number of storm water run-off sample analyses for the reporting years 2017-2018, 2018-2019, 2019-2020, 2020-2021 and 2021-2022 and has not provided an adequate explanation for its failure to do so.

In fact, the Facility has not collected and analyzed any stormwater runoff samples since January 22, 2021.

3.   Failure to Sample Correctly for the Parameter of pH

Pursuant to Section XI.C.2.a of the General Permit, the storm water sample "holding" time for pH analysis is 15 minutes.  Vanderlans & Sons' laboratory report(s) for sample(s) collected on the following dates evidence that the litmus test for the Facility's pH was not conducted within the required 15-minute holding time.

| 2/26/2018 |
|---|
| 11/27/2019 |
| 1/9/2020 |

4.   Failure to Upload Storm Water Sample Analyses within 30 Days

Section XI.B.11.a of the General Permit requires Dischargers to submit all sampling and analytical results for all individual or Qualified Combined Samples via SMARTS within 30 days of obtaining all results for each sampling event.

Vanderlans & Sons failed to upload into SMARTS within 30 days the following sampling and analytical results pursuant to Section XI.B.11.a of the General Permit:

| Sample Date | Lab Report Receipt Date | Date Uploaded into SMARTS |
|---|---|---|
| 2/26/2018 | 3/15/2018 | 11/25/2018 |

5.   Failure to Analyze Storm Water Samples for the Correct Parameters

General Permit sections XI.B.6.a and XI.B.6.b require all Dischargers to analyze for the following three parameters, regardless of facility type:  pH, Total Suspended Solids (TSS) and Oil & Grease (O&G).

Section XI.B.6.c of the General Permit requires Dischargers to analyze for any additional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the

presence of all industrial pollutants identified in the pollutant source assessment contained in the Facility's SWPPP.

EDEN's investigation confirms that the following additional parameters are to be included in the sampling process, as they are associated with the Facility's industrial operations: **benzene, sulfur and ammonia**.

### D. *Inaccurate and Deficient Annual Reports Submitted to the Water Board*

Section XXI.L of the General Permit provides as follows:

**L. Certification**

Any person signing, certifying, and submitting documents under Section XXI.K above shall make the following certification:

*"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."*

Vanderlans & Sons has failed to comply with Sections XVI.A and XXI.L of the General Permit by failing to submit complete and accurate Annual Reports to the Regional Water Board for the reporting years 2017-2018, 2018-2019, 2019-2020, 2020-2021 and 2021-2022.

The Annual Reports included Attachment 1 as an explanation for why Vanderlans & Sons failed to collect and analyze stormwater run-off during the required number of Qualifying Storm Events during the reporting years 2017-2018, 2018-2019, 2019-2020, 2020-2021 and 2021-2022 for all discharge locations, in accordance with Section XI.B.

Eric Vanderlans certified in the Reports, under penalty of perjury, that the required number of stormwater samples were not collected by the Facility because [allegedly] there were insufficient qualifying storm water discharges during the reporting years and scheduled facility operating hours.

However, records from the National Oceanic and Atmospheric Administration (NOAA) website/database confirm that during the reporting years in question there were in fact sufficient Qualified Storm Events (QSEs) occurring near the Facility during or within 12 hours of the start

of regular business hours to allow Vanderlans & Sons to have collected the requisite number of samples.

Specifically, Vanderlans & Sons' Annual Reports submitted to the Regional Water Board through the SMARTS system on July 18, 2018, July 15, 2021 and July 29, 2022 did not contain an acceptable reason for why the Facility failed to collect the appropriate number of stormwater samples.  Further, the Facility did not provide documentation regarding the alleged lack of discharge.

### E.  *Failure to File Timely Annual Reports*

Vanderlans & Sons has failed to comply with Section XVI.A of the General Permit, which provides as follows:  "The Discharger shall certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS."

Vanderlans & Sons' Annual Report for the reporting year 2018-2019 was due on or before July 15, 2019.   However, the Facility has failed to date to submit the Annual Report to the Regional Water Board.

Additionally, Vanderlans & Sons' Annual Report for the reporting year 2019-2020, was filed late on July 15, 2021, resulting in a Notice of Non-Compliance from the Regional Water Board.

### F.  *Deficient BMP Implementation*

Sections I.C, V.A and X.C.1.b of the General Permit require Dischargers to identify and implement minimum and advanced Best Management Practices ("BMPs") that comply with the Best Available Technology ("BAT") and Best Conventional Pollutant Control Technology ("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice, considering technological availability and economic practicability and achievability.

EDEN alleges that Vanderlans & Sons has been conducting industrial activities at the site without adequate BMPs to prevent resulting non-storm water discharges.  Non-storm water discharges resulting from these activities are not from sources that are listed among the authorized non-storm water discharges in the General Permit, and thus are always prohibited.

Vanderlans & Sons' failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each day the Facility discharges storm water without meeting BAT and BCT.

*Specific BMP Deficiencies*

On September 22, 2015, the Facility was inspected by Jenna Yang of the Regional Water Quality Control Board.  During that inspection, Jenna Yang noted the following BMP deficiencies:

1.      Tank water pressure testing was observed in front of the manufacturing building.  Tank water with the potential to discharge to the storm drain system was being released onto the pavement with no Best Management Practices in place.

2.      In the shipping and receiving area, several small pieces of rubber were found on the ground.

3.      The oil and water separator located in the northwest portion of the site was observed to be very dirty, filled with trash and contained stagnate, dark colored water.  Old absorbent booms were also observed in the oil and water separator.

On July 1, 2017, the Facility entered Level 1 status for annual average exceedances of zinc.

On January 6, 2018, P.E. Daniel Barber evaluated the facility, pursuant to Exceedance Response Action requirements of the General Permit.  The Level 1 ERA report certified on July 10, 2018, indicated the following BMP deficiencies:

- Inadequate inlet filtration
- Inadequate preventative maintenance of oil/water separator
- NSWDs - pressure testing and autoclave process water discharges
- Inadequate housekeeping - sweeping

EDEN's investigation confirms that some or all of the aforementioned BMP deficiencies are continuing to occur at the Facility.

### G. *Discharges In Violation of the General Permit*

Except as authorized by Special Conditions of the General Permit, Discharge Prohibition III(B) prohibits permittees from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States.  Unauthorized non-storm water discharges must be either eliminated or permitted by a separate NPDES permit.

Information available to EDEN indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

EDEN alleges that the Discharger has discharged storm water containing excessive levels of pollutants from the Facility to its Receiving Waters during at least every significant local rain event over 0.1 inches in the last five (5) years.

EDEN hereby puts the Discharger on notice that each time the Facility discharges prohibited non-storm water in violation of Discharge Prohibition III.B of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

1. Discharges in Excess of Technology-Based Effluent Limitations

The Industrial General Permit includes technology-based effluent limitations, which prohibit the discharge of pollutants from the Facility in concentrations above the level commensurate with the application of best available technology economically achievable ("BAT") for toxic pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants. (General Permit, Section X.H.)

The EPA has published Benchmark values set at the maximum pollutant concentration levels present if an industrial facility is employing BAT and BCT, as listed in Table 2 of the General Permit. The General Permit includes "Numeric Action Levels" ("NALs") derived from these Benchmark values; however, the NALs do not represent technology-based criteria relevant to determining whether an industrial facility has implemented BMPs that achieve BAT/BCT. (General Permit, Section I.M. (Finding 62)).

Vanderlans & Sons' exceedances of Benchmark values identified in the table listed below, indicate that it has failed and is failing to employ measures that constitute BAT and BCT, in violation of the requirements of the Industrial General Permit. EDEN alleges and notifies Vanderlans & Sons that its storm water discharges from the Facility have consistently contained and continue to contain levels of pollutants that exceed Benchmark values as listed below.

These allegations are based on the Facility's self-reported data submitted to the Regional Water Board. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1492 (9th Cir. 1988).

Vanderlans & Sons' ongoing discharges of storm water containing levels of pollutants above EPA Benchmark values and BAT- and BCT-based levels of control also demonstrate that it has not developed and implemented sufficient BMPs at the Facility. EPA Benchmarks are relevant to the inquiry as to whether a facility has implemented BMPs. [*Cal. Sportfishing Prot. Alliance v. River City Waste Recyclers, LLC* (E.D.Cal. 2016) 205 F.Supp.3d 1128; *Baykeeper v. Kramer Metals, Inc.* (C.D.Cal. 2009) 619 F.Supp.2d 914, 925; *Waterkeepers Northern California v. AG Industrial Mfg. Inc.* (9th Cir. 2004) 375 F.3d 913, 919 (concentration levels in

excess of EPA benchmarks are evidence supporting the citizen plaintiff's contention that defendant did not have appropriate BMPs to achieve BAT/BCT).]

Vanderlans & Sons' failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each day the Facility discharges storm water without meeting BAT and BCT.

    2.   <u>Discharges in Excess of Receiving Water Limitations</u>

In addition to employing technology based effluent limitations, the Industrial General Permit requires dischargers to comply with Receiving Water Limitations. Receiving Water Limitations found in Section VI of the General Permit prohibit storm water discharges and authorized non-storm water discharges to surface water that adversely impact human health or the environment.

Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic species and the environment also constitute violations of the General Permit Receiving Water Limitation.

Applicable Water Quality Standards ("WQS") are set forth in the California Toxics Rule ("CTR") and the Regional Basin Plan. Exceedances of WQS are violations of the Industrial General Permit, the CTR, the Basin Plan, any parameter included as an impairment for the Facility's Receiving Waters on the 303(d) listing, and any parameters identified by the Regional Water Board as parameters assigned a total maximum daily load (TMDL).

Industrial storm water discharges must strictly comply with WQS, including those criteria listed in the applicable Basin Plan. (See *Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166-67 (9th Cir. 1999).)

The Basin Plan establishes WQS for the Mokelumne River and its tributaries, including but not limited to the following:

• Waters shall not contain substances in concentrations that result in the deposition of material that cause nuisance or adversely affect beneficial uses.

• Waters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses.

• Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses.

•    All waters shall be maintained free of toxic substances in concentrations that are lethal to or that produce other detrimental responses in aquatic organisms.

• Surface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use.

Information available to EDEN indicates that the Facility's storm water discharges contain elevated concentrations of specific pollutants, as listed below.   These polluted discharges can be acutely toxic and/or have sub-lethal impacts on the avian and aquatic wildlife in the Receiving Waters.  Discharges of elevated concentrations of pollutants in the storm water from the Facility also adversely impact human health.  These harmful discharges from the Facility are violations of the General Permit Receiving Water Limitation.

Further, EDEN puts Vanderlans & Sons on notice that the Receiving Water Limitations are independent requirements that must be complied with, and that carrying out the process triggered by exceedances of the NALs listed at Table 2 of the General Permit does not amount to compliance with the Receiving Water Limitations.  The NALs do not represent water quality-based criteria relevant to determining whether an industrial facility has caused or contributed to an exceedance of a WQS, or whether it is causing adverse impacts to human health or the environment.

Section XX.B of the General Permit provides that when a facility's industrial storm water discharges and/or authorized NSWDs are determined to contain pollutants that are in violation of Receiving Water Limitations contained in Section VI, the Discharger must conduct a facility evaluation to identify pollutant source(s) within the facility that are associated with industrial activity and whether the BMPs described in the SWPPP have been properly implemented, assess its current SWPPP, and certify via SMARTS any additional BMPs identified which are necessary in order to meet the Receiving Water Limitations.

EDEN alleges that from at least October 14, 2016 to the present, Vanderlans & Sons has been in violation of the Receiving Water Limitations provision of Section VI of the General Permit, as evidenced by its exceedances of the applicable Water Quality Standards set forth in the Regional Basin Plan, indicated below.

Specifically, Vanderlans & Sons' sample analyses summarized below violate the strict numeric effluent limitations (NELs) established for Mokelumne River and Lower Mokelumne River Mokulmne River.

Further, Vanderlans & Sons has failed to comply with Section XX.B of the General Permit.  Failure to comply with the additional Water Quality-Based Corrective Action requirements listed in Section XX.B is an additional violation of the General Permit.

The following discharges of pollutants from the Facility have violated Discharge Prohibitions of the General Permit and are evidence of ongoing violations of Effluent Limitations:

| Sample Collection Date | Outfall | Parameter | Sample Analysis Result* |
|---|---|---|---|
| **Reporting Year 2016-17** | | | |
| 10/14/2016 | SW Drain Inlet | Zinc | 1.05 |
| | | Iron | 1.56 |
| 12/15/2016 | SW Drain Inlet | Iron | 0.582 |
| 1/18/2017 | SW Drain Inlet | Iron | 0.553 |
| | | Zinc | 0.136 |
| | | pH | None |
| 2/2/2017 | SW Drain Inlet | Iron | 1.3 |
| | | Zinc | 0.159 |
| | | | |
| **Reporting Year 2017-18** | | | |
| 2/26/2018 | SW Drain Inlet | Zinc | 0.18 |
| | | pH | None |
| | | | |
| **Reporting Year 2018-19** | | | |
| No samples collected | | | |
| | | | |
| **Reporting Year 2019-20** | | | |
| 11/27/2019 | SW Drain Inlet | Iron | 1.74 |
| | | Zinc | 0.241 |
| | | pH | None |
| 1/9/2020 | SW Drain Inlet | Iron | 1.15 |
| | | Zinc | 0.136 |
| | | pH | None |
| | | | |

| Sample Collection Date | Outfall | Parameter | Sample Analysis Result* |
|---|---|---|---|
| **Reporting Year 2020-21** | | | |
| 1/22/2021 | SW Drain Inlet | Iron | 4.16 |
| | | Zinc | 0.66 |
| | | | |

*All units are listed in milligrams per liter (mg/L), except pH, which is listed in pH units (SU)

Listed below are the EPA Benchmark numeric action levels associated with the parameters, as identified on **Table 2 of the General Permit,** as well as the Maximum Contaminant Levels (MCLs) listed in the **California Code of Regulations, Title 22, Section 64431** (Table 64431-A) and the Water Quality Control Plan (**Basin Plan**) for the **California Regional Water Quality Control Board, Central Valley Regional, Fifth Edition** (Revised May 2018), Basin Plan Table 3-1, Trace Element Water Quality Objectives.

| Parameter | EPA Benchmark Annual NAL | EPA Benchmark NAL instantaneous Value | CV BASIN PLAN Table 3-1 MCL value | CCR Title 22 Section 64431 |
|---|---|---|---|---|
| pH | N/A | >6 or <9 SU | >6.5 or >8.5 | N/A |
| Total Suspended Solids (TSS) | 100 mg/L | 400 mg/L | N/A | N/A |
| Oil & Grease | 15 mg/L | 25 mg/L | N/A | N/A |
| Zinc | .26 mg/L | N/A | .10 mg/L | N/A |
| Copper | .0332 mg/L | N/A | .0056 mg/L | N/A |
| Lead | .262 mg/L | N/A | N/A | .05 mg/L |
| Chemical Oxygen Demand (COD) | 120 mg/L | N/A | N/A | N/A |
| Biochemical Oxygen Demand (BOD) | 30 mg/L | N/A | N/A | N/A |
| Aluminum | .75 mg/L | N/A | N/A | 1.0 mg/L |
| Iron | 1.0 mg/L | N/A | .30 mg/L | N/A |
| Nitrate + Nitrate Nitrogen | .68 mg/L | N/A | N/A | 45 mg/L |
| Phosphorus | 2.0 mg/L | N/A | N/A | N/A |
| Ammonia | 2.14 mg/L | N/A | N/A | N/A |
| Magnesium | .064 mg/L | N/A | N/A | N/A |
| Arsenic | .064 mg/L | N/A | N/A | N/A |
| Cadmium | .0053 mg/L | N/A | .00022 mg/L | .01 mg/L9i |
| Nickel | 1.02 mg/L | N/A | N/A | N/A |
| Mercury | .0014 mg/L | N/A | N/A | N/A |

| Parameter | EPA Benchmark Annual NAL | EPA Benchmark NAL instantaneous Value | CV BASIN PLAN Table 3-1 MCL value | CCR Title 22 Section 64431 |
|---|---|---|---|---|
| Selenium | .005 mg/L | N/A | N/A | N/A |
| Silver | .0183 mg/L | N/A | .01 mg/L | .05 mg/L |

### H. <u>*Failure to Comply with Exceedance Response Action Requirements*</u>

As of July 1, 2015, the date the current General Permit became effective, all Dischargers were in "Baseline status" for all parameters listed in Table 2 of the Permit.   (General Permit, Section XII.B.

<u>Level 1 ERA Evaluation and Report</u>

Pursuant to Section XII.C of the General Permit, a Discharger's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate either an annual average or instantaneous NAL exceedance for that same parameter.

Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred, and the Discharger enters the Exceedance Response Action ("ERA") process.  The ERA process requires the discharger to conduct a Level 1 ERA Evaluation, with the assistance of a Qualified Industrial Storm Water Practitioner ("QISP"), of the industrial pollutant sources at the Facility that are or may be related to the NAL exceedance(s), by October 1 following commencement of Level 1 status.

The Level 1 ERA Evaluation must include the identification of the corresponding BMPs in the SWPPP, as well as any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of the General Permit.

Based upon the Level 1 ERA Evaluation, the Discharger is required to, as soon as practicable, but no later than January 1 following commencement of Level 1 status, prepare a Level 1 ERA Report.  (Section XII.C.2).  The Level 1 Report must be prepared by a QISP and must include a summary of the Level 1 ERA Evaluation, a detailed description of the necessary SWPPP revisions, and any additional BMPs for each parameter that exceeded an NAL.

The SWPPP revisions and additional BMP development and implementation must also be completed by January 1.  The Level 1 status discharger is required to submit via SMARTs the Level 1 ERA Report certifying that the Level 1 ERA Evaluation has been conducted, and necessary SWPPP revisions and BMP implementation has been completed.  The certification

also requires the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status.

A Discharger's Level 1 status for a parameter will return to Baseline status if a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter.

Level 2 ERA Action Plan

A Discharger will enter Level 2 status if there is an NAL exceedance of the same parameter occurring during the time the Discharger is in Level 1 status.

By January 1 following the reporting year during which the NAL exceedance(s) occurred, Dischargers in Level 2 status must certify and submit via SMARTS a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance.

For each new Level 2 exceedance, the Level 2 Action Plan must select one or more of three available "demonstrations" the Facility will perform to address the exceedance(s). These demonstrations include (a) Industrial Activity BMPs; (b) Non-Industrial Pollutant Source Demonstration; and (c) Natural Background Pollutant Source Demonstration, and are more fully described below under the Level 2 Technical Report provisions.

The Level 2 ERA Action Plan must address all drainage areas with corresponding Level 2 exceedances and must include a time schedule and detailed description of the specific tasks required to complete the selected demonstration(s). Further, all elements of the Action Plan must be implemented as soon as possible and completed no later than one year following the submission of the Action Plan.

Level 2 ERA Technical Report

On January 1 of the reporting year following submittal of a Level 2 ERA Action Plan, Dischargers in Level 2 must certify and submit a Level 2 ERA Technical Report prepared by a QISP that includes the Facility's selection of either:

(a) *Industrial Activity BMP Demonstration* (whereby the Facility evaluates their implemented BMPs and additional BMPs identified in the Level 2 ERA Action Plan to determine whether implementation of the BMPs has achieved compliance with the effluent limitations of the General Permit and are expected to eliminate future NAL exceedances;

(b) *Non-Industrial Pollutant Source Demonstration* (whereby the Facility determines that its NAL exceedances are attributable solely to the presence of non-industrial pollutant sources); or

(c) *Natural Background Pollutant Source Demonstration* (whereby the Facility determines that its NAL exceedances are attributable solely to the presence of pollutants in the natural background that has not been disturbed by industrial activities).

**Failure to Submit Level 1 ERA Report**

Based on the sample data summarized above, the Facility exceeded the EPA Benchmark NAL for iron and was elevated to Level 1 Status on July 1, 2020, pursuant to Section XII.C – Exceedance Response Actions -- of the General Permit.

Pursuant to Section XII.C.2 of the General Permit, the Facility was required to have a QISP conduct an evaluation of the Facility by October 1, 2020, and to upload an adequate Level 1 ERA Report on or before January 1, 2021.

As of the date of this Notice, EDEN alleges that Vanderlans & Sons has failed to conduct an adequate Level 1 status evaluation and has also failed to submit a Level 1 ERA report by uploading it into the SMARTS system.

**Failure to Submit Level 2 Action Plan**

While in Level 1 status, the Facility again exceeded the EPA Benchmark NAL for iron and zinc.  These results elevated Vanderlans & Sons to Level 2 Status on July 1, 2021, pursuant to Section XII.D of the General Permit.

Pursuant to Section XII.D.1 of the General Permit, the Facility was required to have a QISP certify and submit via SMARTS a Level 2 ERA Action Plan that addresses each new Level 2 NAL exceedance at the Facility on or before January 1, 2022.

As of the date of this Notice, EDEN alleges that Vanderlans & Sons has failed to submit a Level 2 ERA Action Plan for the Facility by uploading it into the SMARTS system.

Vanderlans & Sons has been in daily and continuous violation of the General Permit's ERA requirements every day since January 1, 2021.  These violations are ongoing, and EDEN will include additional violations when information becomes available.

### I.   *Failure to Comply with the Mandates of the Regional Water Board*

Pursuant to Section XIX.B of the General Permit, Regional Water Boards have general authority to enforce the provisions and requirements of the General Permit, including reviewing SWPPPs, Monitoring Implementation Plans, ERA Reports, and Annual Reports and requiring Dischargers to revise and re-submit PRDs, conducting compliance inspections, and taking enforcement actions.

As fully discussed above, the Regional Water Quality Control Board issued Vanderlans & Sons an official Notice of Non-Compliance on November 19, 2019, requiring that the Facility by December 19, 2019 submit the outstanding 2018-2019 Annual Report.

Vanderlans & Sons has failed to comply with those mandates as of the date of this Notice.

### J.   *Failure to Comply with Facility SWPPP*

The Facility's SWPPP indicates that the Facility will collect and analyze storm water samples from two qualified storm events within the first half of each reporting year (July 1 to December 31) and two QSEs within the second half of each reporting year (January 1 to June 30).

As detailed above, the Facility missed collecting storm water samples in the reporting years 2017-2018, 2018-2019, 2019-2020, 2020-2021 and 2021-2022.

### K.   *Failure to Properly Train Employees/Facility Pollution Prevention Team*

Section X.D.1 of the General Permit requires each Facility to establish a Pollution Prevention Team responsible for assisting with the implementation of the requirements of the General Permit. The Facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

Section X.H.f of the General Permit also requires that each Facility ensure that all Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities. Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

Based on the foregoing violations, it is clear that Vanderlans & Sons has either not properly established its Pollution Prevention Team, or has not adequately trained its Pollution Prevention Team, in violation of Sections X.D.1 and X.H.f of the General Permit.

Vanderlans & Sons may have had other violations that can only be fully identified and documented once discovery and investigation have been completed.  Hence, to the extent possible, EDEN includes such violations in this Notice and reserves the right to amend this Notice, if necessary, to include such further violations in future legal proceedings.

## IV.    THE PERSON OR PERSONS RESPONSIBLE FOR THE VIOLATIONS

The individuals and entities responsible for the alleged violations are Vander Lans & Sons, Inc., as well as its respective corporate officers and employees of the Facility responsible for compliance with the CWA.

## V.    THE DATE, DATES, OR REASONABLE RANGE OF DATES OF THE VIOLATIONS

The range of dates covered by this 60-day Notice is November 1, 2017, to the date of this Notice.  EDEN may from time to time update this Notice to include all violations which may occur after the range of dates covered by this Notice.  Some of the violations are continuous in nature; therefore, each day constitutes a violation.

## VI.    CONTACT INFORMATION

The entity giving this 60-day Notice is:

Central Valley EDEN ENVIRONMENTAL DEFENDERS, LLC
1520 E. Covell Blvd, Suite B5
Davis, CA  95616
(800) 545-7215

**To ensure an expedited response to this Notice, please send all initial communications to the following email address:**  responses@edendefenders.org.

## VII.    RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

CWA §§ 505(a)(1) and 505(f) provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for un-permitted discharges of pollutants.  33 U.S.C. §§ 1365(a)(1) and (f), §1362(5).

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of

the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five (5) years prior to the date of the Notice Letter. **These provisions of law currently authorize civil penalties of $56,460.00 per day, for each violation occurring on or after November 2, 2015.**

In addition to civil penalties, EDEN will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law.

**Lastly, pursuant to Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d) and California Code of Civil Procedure §1021.5, EDEN will seek to recover its pre and post-litigation costs, including all attorneys' and experts' fees and costs incurred** (see *Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017) 853 F.3d 1076; *Vasquez v. State of California* (2008) 45 Cal.4th 243).

## VIII.     CONCLUSION

The CWA specifically provides a 60-day notice period to promote resolution of disputes. EDEN encourages Vanderlans & Sons' counsel to contact EDEN within 20 days of receipt of this Notice by sending an email to responses@edendefenders.org to initiate a discussion regarding the violations detailed herein and to determine how Vanderlans & Sons may resolve this matter without the necessity of litigation.

During the 60-day notice period, EDEN is willing to discuss effective remedies for the violations; however, if Vanderlans & Sons wishes to pursue such discussions in the absence of litigation, it is suggested those discussions be initiated soon so that they may be completed before the end of the 60-day notice period.

If EDEN does not receive a response from Vanderlans & Sons or its counsel before the expiration of the 60-day notice period, this matter will be transferred to EDEN's litigation counsel. Thank you.

Sincerely,

*EDEN Environmental Defenders*

Copies to:

Michael Regan, Director, U.S. Environmental Protection Agency, regan.michael@epa.gov
Regional Administrator, U.S. EPA – Region 9
Sarah Rowan:  rowan.sarah@epa.gov  and Laurie Kermish:  kermish.laurie@epa.gov
Eileen Sobeck, State Water Resources Control Board, eileen.sobeck@waterboards.ca.gov
Mayumi Okamoto, State Water Board Office of Enforcement:  Mayumi.Okamoto@waterboards.ca.gov
California Water Boards Stormwater Program, stormwater@waterboards.ca.gov